# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jose E. Lebron, : 
         Petitioner : 
       : 
       : 
      v. : 
       : 
       : 
Public School Employees' : 
Retirement Board, : No. 1265 C.D. 2019
         Respondent : Argued: September 15, 2020

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION BY
JUDGE COVEY                   FILED: October 30, 2020

Jose E. Lebron (Dr. Lebron) petitions this Court for review of the Public School Employees' Retirement Board's (Board) August 16, 2019[1] order denying his request for post-retirement employment without annuity loss and an adjustment waiver, and affirming the Public School Employees' Retirement System's (PSERS) determination that Dr. Lebron shall repay retirement benefits.[2] Dr. Lebron presents four issues for this Court's review: (1) whether the Board's refusal to enact regulations concerning emergency/personnel shortage returns to employment pursuant to Section 8346(b) of the Public School Employees' Retirement Code (Retirement Code), 24 Pa.C.S. § 8346(b) (also known as Act 63 of 2004, or Act 2004-63), or to issue a written policy notifying PSERS retirees of the standards for same, deprived Dr. Lebron of his due process rights; (2) whether the Board erred by shifting the burden of establishing an emergency or personnel shortage to Dr. Lebron,

---

[1] Although the Board's Opinion and Order was dated August 9, 2019, it was mailed on August 16, 2019.

[2] The Board also denied Dr. Lebron's request for oral argument.

when evidence concerning the same is in the possession of the School District of Philadelphia's (SDP) agent, ASPIRA, Inc. of Pennsylvania (ASPIRA), or PSERS; (3) whether the Board erred by not accepting ASPIRA's judgment that an emergency or shortage of appropriate personnel existed; and (4) whether the Board erred by determining that Dr. Lebron did not qualify for the hardship exception under Section 8303.1 of the Retirement Code, 24 Pa.C.S. § 8303.1. After review, we affirm in part, reverse in part, and vacate and remand in part.

**Facts**

The facts of this case are largely undisputed. Dr. Lebron began employment with the SDP as a teacher in 1970. He became a PSERS member in 1973. *See* Reproduced Record (R.R.) at 127a, 134a. The SDP employed Dr. Lebron as a principal from October 1983 until he retired, effective July 1, 2007.

Section 8346 of the Retirement Code states, in relevant part:

**(a) General rule.--**If an annuitant returns to school service . . . , any annuity payable to him under this part shall cease effective upon the date of his return to school service . . . .

**(a.1) Return of benefits.--**In the event an annuitant whose annuity from the system ceases pursuant to this section receives any annuity payment . . . on or after the date of his return to school service . . . , the annuitant shall return to the [B]oard the amount so received from the system plus statutory interest. . . .

. . . .

**(b) Return to school service during emergency.--**When, in the judgment of the employer, an emergency creates an increase in the work load such that there is serious impairment of service to the public or in the event of a shortage of appropriate subject certified teachers or other personnel, an annuitant or participant receiving distributions may be returned to school service for a period not to extend beyond the school year during which the emergency or

2

shortage occurs, without loss of his annuity or distributions, provided that the annuitant meets the conditions set forth in subsection (b.2) [(relating to age and breaks in service)]. The annuitant or participant receiving distributions shall not be entitled to earn any credited service, and no contributions may be made to the fund or the trust by the annuitant or participant receiving distributions, the employer or the Commonwealth on account of such employment. Such service shall not be subject to member or participant contributions or be eligible for qualification as creditable school service or for participation in the plan, mandatory pickup participant contributions, voluntary contributions or employer defined contributions.

24 Pa.C.S. § 8346.[3] Section 8102 of the Retirement Code defines "[s]chool year" as "[t]he 12-month period which the governmental entity uses for purposes of administration regardless of the actual time during which a member renders service." 24 Pa.C.S. § 8102. Section 211.3(g) of the Board's Regulations states: "For the purpose of the Retirement Code, the school year commences on July 1 and ends on June 30 of the following year." 22 Pa. Code § 211.3(g).

Thus, when a PSERS annuitant returns to work in the public schools pursuant to Section 8346(b) of the Retirement Code (i.e., for emergency or shortage of appropriate personnel during a school year), his/her PSERS annuity distributions continue uninterrupted. *See* R.R. at 181a, 206a. If an annuitant's return to service is not for reasons of emergency or shortage of appropriate personnel, and/or exceeds the subject school year, his/her PSERS annuity distributions must cease. *See* R.R. at 181a.

On July 19, 2004, PSERS published on its website an explanation of how "Act [63 of] 2004[] Affects Retirees Working After Retirement." R.R. at 421a-424a. Although Dr. Lebron does not recall if he specifically reviewed that

---

[3] Section 8346(b.1) of the Retirement Code also authorizes a PSERS member to return to public school service in an extracurricular position without losing retirement benefits. *See* 24 Pa.C.S. § 8346(b.1).

3

publication, he admitted that, as a PSERS member and SDP principal, he was more or less familiar with the Retirement Code, and understood that there were consequences to working in public schools after retirement; in particular, that there were limited exceptions for returning to service, and such return could not exceed one school year. *See* R.R. at 128a-129a, 134a, 139a.

On June 28, 2007, Dr. Lebron attended a PSERS retirement exit counseling session, during which the retirement counselor reviewed, and Dr. Lebron acknowledged his understanding, that he could work in the public schools and still collect his retirement benefits only if there was an emergency or shortage of appropriate personnel and the period of time was limited to one school year, which was from July 1 through June 30 of the following year. *See* R.R. at 98a, 130a-132a, 206a; Dr. Lebron Br. App. A, Board Op., Findings of Fact (FOFs) 6-8. That same day, Dr. Lebron submitted his application to PSERS to retire effective July 1, 2007 (Retirement Application). In the Retirement Application, Dr. Lebron certified to PSERS his understanding that he was prohibited from working in a Pennsylvania public school while simultaneously collecting his monthly annuity, except pursuant to Act 63 of 2004. *See* R.R. at 132a-133a; FOF 10.

By September 6, 2007 Initial Benefit Letter, PSERS notified Dr. Lebron that his monthly gross benefit would be $6,925.08, and included the following notice:

> **EMPLOYMENT AFTER RETIREMENT**
>
> Passed on July 4, 2004, **Act 2004-63** permits a PSERS retiree to be employed by a Pennsylvania public school in emergency, shortage of personnel, and extracurricular situations without loss of the retiree's monthly benefit.
>
> The law defines an **emergency/shortage of personnel situation** as '[w]hen, in the judgment of the employer, an emergency creates an increase in the work load such that there is serious impairment of service to the public or in the event of a shortage of appropriate subject certified teachers or other personnel.' . . .

4

> Both emergency and shortage of personnel situations are restricted to a period not to extend beyond the school year during which the emergency or shortage occurs. . . .
>
> In all situations, a member may not contribute, earn any credited service, nor have the Commonwealth or employer contribute on account of such employment.
>
> If a retiree returns to service that **does not** qualify under Act 2004-63, he or she must advise their [sic] employer of the prior service and should also send a letter to PSERS. This letter should include the retiree's return to service date so that the member's pension may be stopped before an overpayment occurs.

R.R. at 369a (emphasis in original); FOF 13. Dr. Lebron testified that he read and understood the September 6, 2007 Initial Benefit Letter and the notice. *See* R.R. at 135a-136a, 184a; FOF 14.

By April 15, 2009 Finalized Benefit Letter, PSERS informed Dr. Lebron that his finalized gross monthly benefit was $7,703.08, and included the following:

> **EMPLOYMENT AFTER RETIREMENT**
>
> If you return to work, it is your responsibility to notify the employer that you are a PSERS retiree.
>
> **Act 2004-63** permits a PSERS retiree to be employed by a Pennsylvania public school (including charter schools) in an emergency or shortage of personnel and extracurricular situations (certain conditions apply) without loss of the retiree's monthly benefit.
>
> Employers must determine that an emergency or shortage exists and make a 'good faith' effort to hire non-retirees first. Please refer to your Retired Member Handbook [(Handbook)] or PSERS' [w]eb[site] for detailed information.
>
> If a retiree's return to service **does not** qualify under Act 2004-63, the retiree should immediately send a letter to PSERS. This letter should include the retiree's return to service date so that the retiree's monthly benefit may be stopped before an overpayment occurs.

R.R. at 373a (emphasis in original); FOF 16. Dr. Lebron testified that he saw and understood the April 15, 2009 Finalized Benefit Letter and the post-retirement employment explanation. *See* R.R. at 136a-137a, 185a-186a; FOF 17.

Dr. Lebron also testified that he received and read PSERS' Handbook, which explained, in relevant part:

> **Returning to School Service After Retirement**
>
> Act 2004-63 expanded the period of time and conditions under which PSERS retirees may return to Pennsylvania public school employment without loss of their monthly retirement benefit. This law specifically defines the ability of a PSERS retiree to be employed by a Pennsylvania public school in an emergency, shortage of personnel, and extracurricular situations. Public schools include charter schools . . . .
>
> **If you retired under a regular retirement benefit, you may return to Pennsylvania public school employment under the following conditions.**
>
> **Employment Due to Emergency or Shortage of Personnel -**
>
> - Whenever a school employer determines there has been an increase in workload that creates a serious impairement [sic] of service to the public or there is a shortage of personnel, a retiree may return to Pennsylvania school service for a period not to extend beyond the school year during which the emergency or shortage occurs.
>
> The employer makes the determination that these elements have been satisfied. **Employers are expected to first make a 'good faith' effort to secure non-retired school personnel**. PSERS, however, reserves the right to review an employer's determination that a qualifying emergency or shortage exists.
>
> . . . .
>
> **It is your responsibility to notify the employer that you are a PSERS retiree.**

6

. . . .

> If you do return to service under any circumstances other than the provisions covered by Act 2004-63, you must advise your employer that you are a PSERS retiree. You should also send a letter to PSERS including the return to service date so your pension may be stopped before an overpayment occurs.

R.R. at 407a-408a (Handbook pp. 31-32) (emphasis in original); FOF 19. Dr. Lebron testified that he read and understood that portion of the Handbook. *See* R.R. at 138a-139a, 186a; FOF 20.

From 2008 through 2015, PSERS sent newsletters to its retired members, including Dr. Lebron, two to three times per year, all of which were available to members on PSERS' website, and ten of which contained articles about returning to service (*see* R.R. at 140a-141a, 225a-226a, 230a; FOF 76): Summer 2008 (*see* R.R. at 461a; FOF 24); Summer 2009 (*see* R.R. at 467a-469a; FOF 28); Fall 2009 (*see* R.R. at 472a-474a; FOF 30); Fall 2010 (*see* R.R. at 484a-486a; FOF 32); Summer 2011 (*see* R.R. at 492a; FOF 59); Fall 2011 (*see* R.R. at 503a-505a; FOF 60); Vol 2. 2013 (*see* R.R. at 509a; FOF 71); Vol. 1 2014 (*see* R.R. at 512a-513a; FOF 72); Vol. 3 2014 (*see* R.R. at 527a; FOF 73); Vo1. 1 2015 (*see* R.R. at 538a; FOF 75). Dr. Lebron testified that he read most of those newsletters.[4] *See* R.R. at 140a-141a.

---

[4] Similar information was available on PSERS' website. In particular, in July 2008, PSERS also published a pamphlet entitled, *Let's Talk About Returning to School Service After Retirement* (Publication #9660), which was available to members in print and on PSERS' website. *See* R.R. at 139a, 187a-188a, 425a-440a; FOFs 25, 76. In addition, the Summer 2011 newsletter notified recipients of a publication – *PSERS Return to Service Guidelines and Clarifications* (Publication #9682) – then available in print and on PSERS' website. *See* R.R. at 139a, 188a-189a, 492a; FOFs 58, 76; *see also* R.R. at 441a-455a. Although PSERS made this information available to Dr. Lebron, he does not recall reviewing those publications on the website. *See* R.R. at 139a-140a.

Between September 2007 and June 2011, Dr. Lebron served as principal in six post-retirement positions within the SDP for emergency/shortage of appropriate personnel reasons, each for less than one school year: (1) from September to December 2007 (Microsoft High School of the Future, sudden principal resignation); (2) January to June 2008 (Middle Years Alternative School

ASPIRA is a non-profit corporation that provides non-academic management services (such as operations and human resources) to charter schools.[5] *See* R.R. at 73a, FOF 35. In 2011, the SDP's Assistant Superintendent, Evelyn Nuñez (Dr. Nuñez), was ASPIRA's Chief Academic Officer.[6] *See* R.R. at 51a-53a, 72a; FOF 38.

In April 2011, the SDP contracted with ASPIRA to operate Olney High School in North Philadelphia as a charter school – Olney Charter High School (Olney).[7] *See* FOFs 36-37. At that time, the state considered Olney a particularly dangerous, underperforming school. *See* R.R. at 53a-54a; FOF 36. Olney was a Renaissance school, which means it was run by a School Advisory Council (SAC) that made recommendations regarding staffing. *See* R.R. at 55a. Olney's SAC preferred and requested a bilingual African-American or Latino with high school principal experience, familiar with the City of Philadelphia, to be Olney's principal in

---

for the Humanities, principal retired mid-year); (3) September 2008 to June 2009 (Germantown High School, interim principal special assignment); (4) October 2009 to February 2010 (Kensington Creative & Performing Arts High School, principal on maternity leave); (5) February to June 2010 (Lawton Elementary School, principal retired mid-year); (6) August 2010 to June 2011 (Randolph Career Academy, principal died). *See* R.R. at 146a-147a, 149a-156a; FOFs 22-23, 26, 29, 31, 33-34. Dr. Lebron did not inform PSERS about any of those positions. *See* R.R. at 147a, 150a-153a, 155a; FOFs 22-23, 26, 29, 31, 34. Accordingly, Dr. Lebron received a salary from the SDP and collected his monthly annuity payments from PSERS during those assignments. *See* 156a-157a; FOF 34.

[5] Dr. Lebron was a member of ASPIRA's Board of Directors from approximately 1983 to 1988 or 1989, which was before ASPIRA managed charter schools. *See* R.R. at 52a-53a, 160a-161a, 174a-175a.

[6] ASPIRA employed Dr. Nuñez from 2002 to 2013. *See* R.R. at 52a, 70a, 96a, 109a.

[7] Olney had approximately 1,600 students and required between 130 and 200 staff. *See* R.R. at 67a, 106a.

By March 16, 2012 approval, PSERS accepted Olney as a PSERS employer, and its employees became PSERS members, effective July 1, 2011. *See* R.R. at 72a-73a, 224a-225a, 227a-228a; FOF 57. The Board explained in its brief to this Court that because "Olney was not a PSERS participating employer until July 1, 2011[,] . . . the Board determined Dr. Lebron returned [to service] on July 1, 2011, not [on] his actual start date of June 27, 2011. ([Board Op. at] 28)." Board Br. at 14 n.3.

order to be aligned with the student demographic.[8]  *See* R.R. at 55a-56a, 81a-82a; FOF 40.

When ASPIRA acquired the Olney contract, its hiring team[9] immediately offered the Olney principal job to Olney's then-principal, who declined the position.[10]  *See* R.R. at 56a-57a, 81a; FOF 42.  ASPIRA next offered the position to another SDP principal, Debbie Corella (Corella), who also declined.  *See* R.R. at 57a, 81a; FOF 43.  Thereafter, ASPIRA interviewed candidates who submitted resumes, but the candidates did not have principal or high school experience, or they did not otherwise meet the SAC's criteria.  *See* R.R. at 57a-58a, 81a-82a; FOF 44.

In May 2011, ASPIRA contacted Dr. Lebron, who was well-known in the community, and asked him to interview for the Olney principal position.  *See* R.R. at 57a-58a, 80a-81a, 91a, 101a-102a, 157a-163a, 171a-172a; FOF 45.  **At the interview with the hiring team, Dr. Lebron informed ASPIRA that he was retired**, and declared that the only way he could accept the position was if ASPIRA notified PSERS and obtained approval.  *See* R.R. at 58a-59a, 64a, 102a-104a, 143a, 159a-162a, 171a-172a; FOF 47.  ASPIRA's hiring team agreed that the Chief Operating Officer and the Human Resources Director would notify PSERS regarding Dr. Lebron's return to service.  *See* R.R. at 64a-65a.

On May 23, 2011, ASPIRA contracted with Dr. Lebron to be Olney's principal from June 27, 2011 to August 17, 2012,[11] during which time he would

---

[8] ASPIRA was open to hiring someone who was not bilingual, if necessary.  *See* R.R. at 82a; FOF 40.

[9] ASPIRA's hiring team consisted of its high-level administrative staff, including: Chief Executive Officer Alfredo Calderon, Chief Financial Officer Murray Roseman, Chief Operating Officer Orlando Rendon, Human Resources Director Marisol Morales, Curriculum Instruction Director Susan Ostrich, and Dr. Nuñez.  *See* R.R. at 58a, 101a-102a; FOF 46.

[10] Olney's former principal's name is not contained in the record before this Court.

[11] Dr. Lebron's 2011-2012 contract included the contract term, his annualized salary, the requirement that he maintain a satisfactory performance rating, health, dental, and short- and long-term disability plan information, and also referenced his eligibility to participate in PSERS.  *See* R.R. at 102a, 163a-165a; FOF 52.

mentor two assistant principals with the goal that one of those individuals would become principal in June 2012.[12]  *See* R.R. at 66a-67a, 90a, 102a, 104a-105a, 107a, 164a-165a; FOFs 52, 54, 56, 61.  Dr. Lebron's 2011-2012 contract with ASPIRA did not reference an emergency or shortage of appropriate personnel.  *See* R.R. at 165a.

ASPIRA sent the other Olney principal candidates rejection letters wherein it informed them that, although their "'skills and qualifications were excellent,' it had 'chosen to hire another candidate for the position.'"  R.R. at 5a; *see also* R.R. at 78a-80a, 211a-213a, 217a-220a; FOFs 55, 86.

After the 2011-2012 school year, the criteria for Olney's principal remained the same, and ASPIRA determined that neither of Olney's assistant principals were ready to assume the principal role.  *See* R.R. at 68a, 71a, 89a, 108a-109a; FOFs 62, 67.  After ASPIRA advertised Dr. Lebron's position and did not receive any resumes, it offered the principal position to Dr. Lebron for the 2012-2013 school year (i.e., July 1, 2012 to June 30, 2013), and he again contracted with ASPIRA under the condition that it notify and obtain PSERS' approval.[13]  *See* R.R. at 68a-69a, 92a, 109a, 166a-168a; FOFs 63-64.  Dr. Lebron's 2012-2013 contract with ASPIRA did not mention an emergency or shortage of personnel.  *See* R.R. at 166a; FOF 65.

At the end of the 2012-2013 school year, both assistant principals resigned, and Dr. Nuñez's predecessor, Dr. Lucilla Paramo (Dr. Paramo), offered Dr. Lebron the position for the 2013-2014 school year with two new assistant principals, and Dr. Lebron accepted the offer for the contract term August 1, 2013 to July 31, 2014.[14]  *See* R.R. at 70a, 109a-111a; FOFs 68-69.  After neither of the two assistant

---

[12] The assistant principals were not bilingual.  *See* R.R. at 89a.

[13] With the exception of the contract term and salary, Dr. Lebron's 2012-2013 contract was substantially similar to his 2011-2012 contract.  *See* R.R. at 69a, 166a; FOF 64.

[14] With the exception of the contract term, Dr. Lebron's 2013-2014 contract was substantially similar to his previous ASPIRA contracts.  *See* R.R. at 111a, 166a-167a; FOF 69.

principals were able to assume Dr. Lebron's role, ASPIRA contracted with Dr. Lebron for the 2014-2015 school year.[15]  *See* R.R. at 113a-114a, 168a-169a; FOF 74. ASPIRA terminated Dr. Lebron's position as Olney's principal on June 25, 2015. *See* R.R. at 169a-170a; FOF 77.

Dr. Lebron never sought PSERS' approval to return to work as Olney's principal, or confirmed that ASPIRA or the SDP did so.  *See* R.R. at 162a-163a; FOF 78.  Neither ASPIRA nor the SDP ever sought approval from or notified PSERS of Dr. Lebron's return to service as Olney's principal.  *See* R.R. at 225a; FOF 79.  No retirement deductions were taken from Dr. Lebron's pay while he worked at Olney, nor did ASPIRA pay its employer share.  *See* R.R. at 174a, 200a; FOFs 80, 90.

In April 2015, based on information ASPIRA sought from PSERS about PSERS' annuitants employed in its charter schools whose PSERS' contributions were not being withheld, PSERS learned that Dr. Lebron was working at Olney.  *See* R.R. at 191a-197a, 208a-209a; FOF 82.  PSERS sent its standard request to ASPIRA (copied to Dr. Lebron) for information about the nature of Dr. Lebron's employment, in particular, proof of the steps it took to secure a non-annuitant for the Olney principal job each year.  *See* R.R. at 189a-192a; FOFs 83-84.  ASPIRA responded that it regarded Dr. Lebron as an emergency hire for the subject school years; however, based on ASPIRA's documentation, PSERS determined that Dr. Lebron had been working at Olney in a non-emergency capacity.  *See* R.R. at 197a-198a, 210a.

By September 1, 2015 letter, PSERS' Retirement Administrator, Troy Peechatka (Peechatka), notified Dr. Lebron of PSERS' determination that Dr. Lebron returned to active employment with the SDP on July 1, 2011, and that it would discontinue Dr. Lebron's retirement benefits as of September 30, 2015, and

---

[15] Dr. Lebron's 2014-2015 contract was substantially similar to his previous ASPIRA contracts.  *See* R.R. at 113a-114a, 168a-169a; FOF 74.

recalculate the debits and credits on his account as a result of his active employment.[16] *See* R.R. at 1a-2a, 198a-199a, 210a-211a; FOFs 86-87. Peechatka explained:

> ASPIRA [] represented that it recruited and interviewed numerous candidates prior to the start of the 2011-2012 school year for the principal and co-principal position[s] but advised the candidates that, although their 'skills and qualifications were excellent,' it had 'chosen to hire another candidate for the position.' The basis of an emergency employment when choosing a retiree over a non-retiree is that a qualified applicant is sought rather than the best qualified. Voluntarily choosing not to hire a qualified non-annuitant, regardless of the reason, does not establish a shortage of personnel that exempts you from the return to service provisions in the Retirement Code.

R.R. at 5a; *see also* R.R. at 210a-211a; FOFs 86-87. PSERS determined from ASPIRA's rejection letters to the 2011 candidates that ASPIRA considered the other candidates' skills and qualifications excellent. *See* R.R. at 211a-213a; FOF 55.

On October 1, 2015, Dr. Lebron appealed from the September 1, 2015 determination to PSERS' Executive Staff Review Committee (ESRC), requesting that PSERS consider him in service at Olney for the 2011-2012 school year through June 30, 2015, pursuant to Section 8346(b) of the Retirement Code, stating that he was the only candidate ASPIRA could find with the special skills and experience needed at Olney, that ASPIRA hired him on an emergency basis for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years, and that he believed he was employed at Olney in accordance with Section 8346(b) of the Retirement Code. *See* R.R. at 3a-6a, 203a; FOF 88.

---

[16] Beginning on August 19, 2015, and continuing through the July 11, 2018 hearing, the SDP employed Dr. Lebron as principal of Kensington High School. *See* R.R. at 97a-98a, 170a, 202a; FOF 85. On October 26, 2015, the SDP reported to PSERS that Dr. Lebron had returned to service, which triggered PSERS to stop his annuity payments and begin crediting his return as an active member. *See* R.R. at 201a-202a, 204a; FOF 85.

Dr. Lebron argued:

> The [ESRC] should grant the relief requested because the law specifies that the emergency determination is to be made 'in the judgment of the employer.' There is no properly promulgated regulation supporting [] PSERS['] position in this matter. The court cases only authorize PSERS to reverse that determination in situations tantamount to fraud on the part of the employer. (*Baillie v.* [*Pub. Sch. Emps.' Ret. Bd.*], 9[9]3 A.2d 9[4]4 ([Pa.] Cmwlth. 2010)). Additionally, even assuming arguendo some validity to [] PSERS['] position, this would be a proper case for relief under [Section 8303.1 of the Retirement Code].

R.R. at 4a. Dr. Lebron also requested copies of all information that ASPIRA provided to PSERS regarding his Olney employment. *See* R.R. at 4a.

By determination dated November 5, 2015, PSERS informed Dr. Lebron that it had removed his name from its annuitant payroll and re-enrolled him as an active, contributing PSERS member, and directed him to repay, within 30 days, the $378,686.00 in retirement benefits he received between July 1, 2011 and August 31, 2015.[17] *See* R.R. at 124a, 199a-201a, 334a; FOF 89. On November 24, 2015, Dr. Lebron appealed from PSERS' repayment notice to the ESRC. *See* FOF 92.

On August 16, 2016, the ESRC denied Dr. Lebron's request that PSERS consider his service at Olney for the subject period as in accordance with Section 8346(b) of the Retirement Code, stating that although ASPIRA claims his employment as Olney's principal was an emergency, ASPIRA failed to show it made a bona fide effort to hire a non-retired employee for the position. *See* R.R. at 7a-14a;

---

[17] PSERS did not credit Dr. Lebron with service for the time ASPIRA employed him because ASPIRA did not provide the salary and service information PSERS requested. *See* R.R. at 200a; FOF 91. However, PSERS will credit Dr. Lebron for those service years if it receives the necessary documentation. *See* R.R. at 200a; FOF 91. ASPIRA will also owe its employer share of the contribution, plus interest for each year ASPIRA did not submit it to PSERS. *See* R.R. at 200a; FOF 90.

FOF 93. Although the ESRC was authorized to seek additional information from Dr. Lebron, it did not do so. *See* R.R. at 216a.

On September 14, 2016, Dr. Lebron appealed from the ESRC's denial to the Board, requested a hearing, and again asked for "all of the information that ASPIRA ha[d] provided to [] PSERS or the ESRC pertaining to [his] service beginning June 27, 2011." R.R. at 19a; *see also* R.R. at 15a-24a; FOF 94.

On October 4, 2016, PSERS filed an answer to Dr. Lebron's appeal,[18] and therein objected to Dr. Lebron's document request on the basis that "there is no formal discovery under the General Rules of Administrative Practice and Procedure [(GRAPP)], 1 Pa. Code §[§] 31.1[-35.251]."[19] R.R. at 32a; *see also* R.R. at 25a-40a; FOF 95. Nearly three years after his initial request, and just weeks before the hearing, PSERS supplied Dr. Lebron with the requested documents in mid-June 2018. *See* R.R. at 291a, 307a. A hearing was held before a Board-appointed hearing examiner (Hearing Examiner) on July 11, 2018. *See* R.R. at 41a-232a; FOF 96.

At the hearing, Dr. Nuñez testified that, before ASPIRA acquired the Olney contract, ASPIRA had publicized that it was competing for the contract and advertised the principal position. *See* R.R. at 56a-57a, 76a-77a. Dr. Nuñez claimed that ASPIRA's advertising for the Olney principal position consisted of internal

---

[18] According to the Board:

> By letter dated October 12, 2016, the [Board's] Appeal Docket Clerk notified [ASPIRA] of [Dr. Lebron's] appeal and explained that ASPIRA may elect to participate as an intervenor because[,] as [Dr. Lebron's] former employer, ASPIRA may have a financial interest in the appeal. The Appeal Docket Clerk's letter directed ASPIRA to file a petition to intervene no later than October 24, 2016. ASPIRA did not file a petition to intervene.

Board Op. at 2.

[19] "[A]s 'a general rule, discovery as provided by the rules of civil procedure are not available in administrative proceedings.'" *C.S. v. Dep't of Human Servs., Bureau of Hearings & Appeals*, 184 A.3d 600, 606 (Pa. Cmwlth. 2018) (quoting *Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 981 A.2d 975, 997 n.18 (Pa. Cmwlth. 2009)).

emails (LISTSERV) to school employees, posts on PAREAP (a Pennsylvania teaching job website), ASPIRA's website and social media pages, and notices in The Philadelphia Inquirer and at local universities. *See* R.R. at 82a-87a. Dr. Nuñez recalled that she assisted ASPIRA in hiring principals for its other charter schools for the 2011-2012 and 2012-2013 school years. *See* R.R. at 92a-93a.

Dr. Nuñez described that the new principal's duties at Olney beginning June 2011 entailed overseeing construction to combine two school buildings, interviewing and hiring nearly 200 employees, and researching publishing companies and obtaining academic resource materials for the 2011-2012 school year. *See* R.R. at 67a-68a; FOF 41. She explained that all of this work created the greatest sense of urgency because it had to be done within two months, and the number of candidates with experience running high schools had declined. *See* R.R. at 71a; FOF 48. Dr. Nuñez declared that the hiring team relied on Dr. Lebron's representations about the process of employing him as a retiree and the hiring team appointed the Chief Operating Officer and the Human Resources Director to follow up with PSERS. *See* R.R. at 65a.

Dr. Lebron testified that, after he informed the hiring team at his May 2011 interview that he could not accept the job as Olney's principal for the 2011-2012 school year unless ASPIRA deemed it an emergency hire, "[the hiring team] indicated -- since it was an emergency they [sic] were going to be contacting PSERS," and he assumed ASPIRA did so. R.R. at 162a; *see also* R.R. at 103a-104a, 161a-162a, 171a-172a; FOFs 47, 49. Dr. Lebron did not recall thereafter asking ASPIRA's hiring team if it had contacted PSERS, nor did he seek anything in writing to that effect. *See* R.R. at 162a-163a. He further recognized that his contract for the 2011-2012 school year referenced that he was eligible to participate in PSERS but, in light of his representations at his interview, he did not consider that form language applicable to him. *See* R.R. at 165a. Dr. Lebron acknowledged that the contract did

not reference an emergency or shortage of appropriate personnel. *See* R.R. at 165a; FOF 53. The same was true for his 2012-2013, 2013-2014 and 2014-2015 school year contracts. *See* R.R. at 166a-169a; FOFs 65, 70, 74.

Dr. Lebron began work under his contract on June 27, 2011, to make Olney fully operational by: coordinating building upgrades; identifying, interviewing and hiring approximately 125 teachers and staff; establishing procedures; developing community relationships; creating safety protocols; and researching curriculum materials. *See* R.R. at 104a-106a; FOF 56. Dr. Lebron explained that, during the course of his contract, he was also responsible for training the two assistant principals to eventually run Olney. *See* R.R. at 107a.

Dr. Lebron testified that he understood his initial Olney employment would be for the 2011-2012 school year but, in light of the continued growth and development of Olney during that year, neither assistant principal was ready to take over, and ASPIRA was unable to find a replacement for him, so he agreed to remain on for the 2012-2013 school year, subject to PSERS' continued approval. *See* R.R. at 108a-109a; FOF 63. He recounted that Dr. Paramo approached him in 2013 about staying on for the 2013-2014 school year, and he was satisfied with her representations that he was still needed. *See* R.R. at 109a-111a; FOF 68. Dr. Lebron recalled that the same situation occurred relative to the 2014-2015 school year, because the new assistant principals assigned for the 2013-2014 school year were unable to accept the principalship for the 2014-2015 school year. *See* R.R. at 113a-114a; FOF 74.

Dr. Lebron acknowledged that he had read and understood the return to service restrictions presented to him by the retirement counselor in June 2007, in his September 6, 2007 Initial Benefit Letter, in his April 15, 2009 Finalized Benefit Letter, in the Handbook, and in the newsletters he read. *See* R.R. at 131a-132a, 136a-141a. Dr. Lebron attested:

Q  Did you believe you were responsible for submitting a letter to PSERS for your post[-]retirement employment?

A  I didn't think so.

Q  Did you believe that you were responsible to have your employer do that?

A  I think so, yes.

Q . . . . Did you understand that your employer may have to document the basis for your emergency?

A  Yes.

Q  Did you ever ask ASPIRA to keep documentation regarding your employment?

A  I mentioned it to the [hiring team] that day, you [sic] got to get the clearance in order for me to be employed, clearance from PSERS.

R.R. at 142a-143a. Dr. Lebron admitted that he did not tell PSERS that he was returning to service. *See* R.R. at 146a; FOF 78. He understood that it was his employer's responsibility to notify PSERS and, since ASPIRA told him it would take care of contacting PSERS, he did not think he had anything further to do in that regard. *See* R.R. at 172a-173a; FOF 78. Dr. Lebron represented that repaying the $378,686.00 in retirement benefits he received between July 1, 2011 and August 31, 2015, "would wipe [him] out"; he did not have the money to repay PSERS. R.R. at 125a; *see also* R.R. at 124a.

Peechatka testified that his job responsibilities include examining whether an annuitant has returned to service in an approved capacity (i.e., whether the employment meets one of the Retirement Code's post-retirement exceptions). *See* R.R. at 176a-178a, 181a-182a. He explained relative to the personnel shortage exception that, when an employer has unsuccessfully attempted to secure a non-retiree for a position, it is permitted to use an annuitant for as long as the shortage lasts for that school year. *See* R.R. at 179a. He added that "the Retirement Code

17

does not address the best qualified, only the shortage." R.R. at 179a; *see also* R.R. at 210a-211a. Peechatka stated that, when investigating personnel shortage cases, PSERS looks at evidence of good faith steps the employer took to secure a non-annuitant, including documentation of employer outreach by job postings, professional journals, headhunters and other methods. *See* R.R. at 180a, 210a.

Peechatka further expressed that an annuitant can serve in an emergency capacity for as long as the emergency lasts during the school year, and a sudden, unexpected increase in workload that the current school staff is not able to handle, in addition to its regular duties, constitutes an emergency. *See* R.R. at 180a. He described that, if an emergency goes beyond the school year, PSERS would need to see proof of the steps the employer took throughout the school year to secure a non-annuitant before it would approve an emergency hire for another year. *See* R.R. at 181a. Peechatka declared that an annuitant may not continue working in an emergency capacity to train his/her replacement. *See* R.R. at 181a. Peechatka recalled reviewing Dr. Lebron's case and determining, based on ASPIRA's documentation, that Dr. Lebron returned to service in a non-approved capacity. *See* R.R. at 179a.

When Peechatka was asked: "Is there a form for PSERS retirees returning in an emergency capacity?" he replied: "No, there's not." R.R. at 205a. When asked: "Why not?" Peechatka responded: "I don't have an answer for that." R.R. at 205a. Peechatka acknowledged that Dr. Lebron's September 6, 2007 Initial Benefit Letter, his April 15, 2009 Finalized Benefit Letter and the Handbook do not specify that Dr. Lebron had an affirmative obligation under Section 8346(b) of the Retirement Code to do anything if he returned to work in an emergency capacity; but, rather, only if he returned to service in a position that was not an emergency. *See* R.R. at 207a-208a. Peechatka reported that, based upon the documentation that ASPIRA provided to PSERS, including the other candidates' resumes and rejection

letters, ASPIRA could have hired any of them in Dr. Lebron's place. *See* R.R. at 211a-213a, 217a-220a. Peechatka stated, however, that ASPIRA did not submit its original job posting, so PSERS was not aware of what ASPIRA listed as the specific requirements for the position. *See* R.R. at 213a-216a. To Peechatka's knowledge, neither ASPIRA nor the SDP sought PSERS' approval for Dr. Lebron to return to service at any time before April 2015. *See* R.R. at 225a.

On November 29, 2018, after the parties filed post-hearing briefs,[20] the Hearing Examiner issued an Opinion and Recommendation that the Board should affirm PSERS' November 5, 2015 repayment letter because: Dr. Lebron was afforded due process; because Dr. Lebron failed to demonstrate by a preponderance of the evidence that his service as Olney's principal for the subject school years was due to an emergency or personnel shortage, the Board should deny his claim that he was exempt from loss of annuity under Section 8346(b) of the Retirement Code; and, because Dr. Lebron failed to prove by a preponderance of the evidence that he satisfied the four prongs of Section 8303.1 of the Retirement Code, the Board should deny his adjustment waiver request. *See* Dr. Lebron Br. App. B, Hearing Examiner Recommendation at 1.

On December 31, 2018, Dr. Lebron filed a Brief on Exceptions and requested oral argument before the Board. *See* R.R. at 301a-312a. Dr. Lebron specifically excepted on the following bases: (1) he was the latest victim of the Board's failure to promulgate and adopt rules and regulations pursuant to Section 8502(h) of the Retirement Code, 24 Pa.C.S. § 8502(h), concerning annuitant emergency/personnel shortage returns to employment; (2) PSERS' basis for determining an invalid return to service under Section 8346(b) of the Retirement Code was not supported by substantial evidence; (3) PSERS is not authorized to

---

[20] *See* R.R. at 233a-299a; FOF 97.

19

review a school employer's judgment that it has an emergency situation; and (4) PSERS' position that he did not meet the hardship test under Section 8303.1(a)(1) of the Retirement Code is specious. *See* R.R. at 302a-311a.

On January 18, 2019, PSERS filed a letter brief in lieu of a brief opposing Dr. Lebron's exceptions, wherein it responded that: (1) Dr. Lebron failed to cite any legal authority for his claim that the Board's failure to promulgate rules and regulations is a basis for relief and ignores the existence of the *Baillie* Court's contrary ruling that PSERS is authorized to review a school employer's use of an annuitant; (2) Dr. Lebron failed to except to any specific finding of fact; (3) this Court's *Baillie* and *Volpe v. Public School Employees' Retirement Board* (Pa. Cmwlth. No. 1837 C.D. 2016, filed October 24, 2017)[21] decisions authorized PSERS to review ASPIRA's judgment that an emergency existed; and (4) Dr. Lebron failed to prove that he met the requirements for a waiver under Section 8303.1 of the Retirement Code. *See* R.R. at 313a-318a.

On August 16, 2019, the Board denied Dr. Lebron's request for oral argument; denied his request that his post-retirement employment as Olney's principal during the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years be deemed an acceptable return to service without loss of annuity under Section 8346(b) of the Retirement Code; denied his waiver request; and affirmed PSERS' November 5, 2015 repayment letter. *See* Board Op. at 44. Dr. Lebron appealed to this Court.[22]

---

[21] This Court acknowledges that its unreported memorandum opinions may only be cited "for [their] persuasive value, but not as binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a). *Volpe* is cited herein for its persuasive value.

[22] This Court's scope of review of the Board's opinion and order is limited to determining whether substantial evidence supported the Board's necessary findings of fact, whether the Board violated constitutional rights, or whether the Board committed an error of law. *See Robertson v. Pa. Pub. Sch. Emps.' Ret. Sys.*, 162 A.3d 569 (Pa. Cmwlth. 2017); *see also Hairston-Brown v. Pub. Sch. Emps.' Ret. Bd.*, 78 A.3d 720 (Pa. Cmwlth. 2013). "Substantial evidence is such relevant evidence

**Discussion**

Dr. Lebron argues that the Board's refusal to enact regulations deprived him of his due process rights, that the Board erred by shifting the burden of proof to him, and that the Board ignored ASPIRA's judgment that an emergency or shortage of appropriate personnel existed. The crux of Dr. Lebron's appeal is that, since he did all that PSERS required of him, he should not be penalized for returning to service at Olney for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years in the face of ASPIRA's determination that there was an emergency/shortage of appropriate personnel.

> Section 8346(b) of the Retirement Code states, in pertinent part:
>
> > When, ***in the judgment of the employer*, an emergency creates an increase in the work load** such that there is serious impairment of service to the public **or in the event of a shortage of *appropriate*** subject certified teachers or **other personnel, an annuitant** or participant receiving distributions **may be returned to school service for a period not to extend beyond the school year during which the emergency or shortage occurs, without loss of his annuity or distributions**[**.**]

24 Pa.C.S. § 8346(b) (bold and italic emphasis added). That provision expressly authorizes the public school *employer* to judge whether circumstances are sufficient to hire an annuitant without affecting the annuitant's retirement benefits. Section 8346(b) of the Retirement Code does not specify that PSERS can review the employer's determination.

> However, in *Baillie*, this Court expounded:
>
> > Section 8521[(e)] of the Retirement Code provides that PSERS and its Board 'stand in a fiduciary relationship to the members of the system regarding the investments and disbursements of any of the moneys of the fund.' 24

as a reasonable mind might accept as adequate to support a conclusion." *Hairston-Brown*, 78 A.3d at 727 (quotation marks omitted).

21

Pa.C.S. § 8521(e). PSERS is responsible for the 'uniform administration' of the public school employees' retirement system. 24 Pa.C.S. § 8502(h). To that end, PSERS' interpretation of the Retirement Code should not be overturned unless it is clear that such construction is erroneous. In addition, Section 8534(b) of the Retirement Code requires PSERS to correct all intentional or unintentional errors in members' accounts.[23] In other words, **PSERS has the duty to correct errors made by public school employers** and to make actuarial adjustments to an individual member's benefit payments. . . .

. . . **PSERS would breach its fiduciary duty if it allowed a member to receive an annuity after returning to school service under circumstances that do not constitute an 'emergency.'** [The public school employer] made the initial determination that an emergency existed; however, **the final decision for matters affecting disbursements to annuitants must rest with PSERS**. Otherwise, public school employers would have the final say in matters that have statewide implication and can affect the solvency of the fund. Accordingly, we hold that **PSERS has the authority to review whether a public employer's decision to return a retired employee to work was, in fact, done on the basis of an emergency as defined in Section 8346(b) of the Retirement Code**.

*Baillie*, 993 A.2d at 949-50 (emphasis added; citation and footnotes omitted);[24] *see also Volpe*. Although the statute does not so specify, in the *Baillie* Court's ruling that

---

[23] Section 8534(b) of the Retirement Code provides, in relevant part:

Should any change or mistake in records result in any member . . . receiving from the system or plan more or less than he would have been entitled to receive had the records been correct, then regardless of the intentional or unintentional nature of the error and upon the discovery of such error, the [B]oard shall correct the error and if the error affects contributions to or payments from the system, then so far as practicable shall adjust the payments which may be made for and to such person in such a manner that the actuarial equivalent of the benefit to which he was correctly entitled shall be paid.

24 Pa.C.S. § 8534(b).

[24] Although *Baillie* is factually distinguishable from the instant matter, these rules of law are nevertheless controlling here.

PSERS was authorized to review ASPIRA's determination that Dr. Lebron's return to service met the emergency/shortage of appropriate personnel exceptions in Section 8346(b) of the Retirement Code, it noted that in order for PSERS to uphold its fiduciary duty in administering the Retirement Code, it must determine that the employer properly exercised its judgment.

Moreover, "[t]he law is clear that the Board is the ultimate finder of fact and arbiter of witness credibility. As long as the Board's factual findings are supported by substantial evidence those findings are conclusive on appeal." *White v. Pub. Sch. Emps.' Ret. Bd.*, 11 A.3d 1, 7 (Pa. Cmwlth. 2010) (citation omitted).

### 1. Regulations

Although Section 8502(h) of the Retirement Code directs the Board that it "**shall** . . . adopt and promulgate rules and regulations for the uniform administration of the system[,]" 24 Pa.C.S. § 8502(h) (emphasis added), the Board has not done so. Dr. Lebron contends that the Board's failure to promulgate regulations violated his due process rights. However, Dr. Lebron did not proffer, and this Court has not found, any case law declaring that an administrative agency's failure to promulgate regulations creates legal rights in an individual. Accordingly, despite that regulations would provide for "uniform administration" and make the parties' rights and responsibilities under Section 8346(b) of the Retirement Code clearer, the Board's failure to promulgate regulations did not deprive Dr. Lebron of his due process rights.[25]

---

[25] Notwithstanding, this Court **strongly urges the Board to perform its ministerial duty** to "adopt and promulgate . . . [rules and] regulations[,]" 24 Pa.C.S. § 8502(h), to avoid similar future litigation.

## 2. Burden of Proof

Dr. Lebron argues that the Board erred by shifting the burden of establishing an emergency/shortage of appropriate personnel to him, when evidence concerning the same was in ASPIRA's or PSERS' possession.

This Court has held relative to Board cases:

> [I]t is well-established that the party who maintains the existence of certain facts . . . must prove those facts by a preponderance of the evidence. *Wingert v. State Emp[s.'] Ret[.] B[d.],* . . . 589 A.2d 269, 271 ([Pa. Cmwlth.] 1991); *Samuel J. Lansberry, Inc. v. P[a.] Pub[.] Util[.] Comm['n],* . . . 578 A.2d 600, 602 ([Pa. Cmwlth.] 1990). A preponderance of the evidence is 'such proof as leads the fact-finder . . . to find that the existence of a contested fact is more probable than its nonexistence.' *Sigafoos v. P[a.] B[d.] of Prob[.] [&] Parole,* . . . 503 A.2d 1076, 1079 ([Pa. Cmwlth.] 1986).

*Hamilton v. Pa. State Emps.' Ret. Bd.*, 194 A.3d 1147, 1154-55 (Pa. Cmwlth. 2018). In the instant matter, the Board misinterprets that Dr. Lebron is the only party maintaining the existence of the operative facts and, thus, he had the sole burden of proof.

Section 8346(b) of the Retirement Code expressly states that it is applicable "[w]hen, *in the judgment of* [*ASPIRA,*]" Dr. Lebron's return to service at Olney for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years was due to an emergency or shortage of appropriate personnel.[26]  24 Pa.C.S. § 8346(b)

---

[26] The notices included with Dr. Lebron's September 6, 2007 Initial Benefit Letter, April 15, 2009 Finalized Benefit Letter, and the Handbook confirmed that, whether an emergency or shortage exists is determined by the retiree's *employer*. *See* 24 Pa.C.S. § 8346(b); *see also* R.R. at 369a, 373a, 407a; FOFs 13, 16, 19.  The notice in his April 15, 2009 Finalized Benefit Letter and the Handbook further clarified that, before hiring an annuitant, the *employer* must first make a good faith effort to hire a non-annuitant. *See* R.R. at 373a, 407a; FOFs 16, 19.  The Handbook added: "PSERS . . . reserves the right *to review an employer's determination* that a qualifying emergency or shortage exists."  R.R. at 407a (emphasis added); FOF 19.  Although Dr. Lebron does not recall reading it, *PSERS' Return to Service Guidelines and Clarifications* on PSERS' website details what

(emphasis added). This Court in *Baillie* held that when *the employer* has determined the existence of an emergency or personnel shortage, PSERS may review *the employer's* determination. In addition, Peechatka declared that, in these cases, PSERS examines evidence *of the good faith steps the employer took* to secure a non-annuitant. Further, PSERS sent its information request concerning the nature of Dr. Lebron's employment as Olney's principal *to ASPIRA*, and the Board found: "PSERS had not received satisfactory documentation *from ASPIRA*[.]"[27] FOF 86 (emphasis added). Finally, for nearly three years, Dr. Lebron repeatedly asked PSERS for copies of the documents ASPIRA provided in response to PSERS' request, but PSERS responded that *he was not entitled to discovery*.[28]

Moreover, Peechatka and the Board acknowledged that **Dr. Lebron had no affirmative obligation to notify PSERS or seek permission to return to work in accordance with Section 8346(b) of the Retirement Code**. Notwithstanding, the Board declared that Dr. Lebron had the burden of proof because he had knowledge or was put on notice that his return to service was not justified under Section 8346(b) of the Retirement Code.

The Board reasoned:

> [Dr. Lebron] received [the Handbook], which he read and reviewed. In particular, [Dr. Lebron] read the portions of [the Handbook] about returning to service after retirement, the statements that[:] 'PSERS, however, reserves the right to review an employer's determination that a qualifying emergency or shortage exists,'[;] '[**i**]**t is your**

---

information may be required from *the employer* to prove that an emergency or personnel shortage existed. *See* R.R. at 447a.

[27] Although PSERS copied Dr. Lebron on the request, it was not addressed to him.

[28] PSERS eventually supplied Dr. Lebron with ASPIRA's documents approximately four weeks before the hearing, which afforded him little time to seek additional information. This Court does not countenance PSERS' three-year delay in granting Dr. Lebron's request until one month before the July 2018 hearing, thereby affording Dr. Lebron insufficient time between mid-June 2018 and the hearing to follow up or subpoena additional information under GRAPP.

25

**responsibility to notify the employer that you are a PSERS retiree**,'[;] and[,] '[i]f you do return to service under any circumstances other than the provisions covered by Act 2004-63, you must advise your employer that you are a PSERS retiree. *You should also send a letter to PSERS including the return to service date so your pension may be stopped before an overpayment occurs*.' Exhibit PSERS-5 (emphasis added).

[Dr. Lebron] read and understood these statements, clearly gaining the knowledge that he may have returned to service in error, but **he took no steps to inform PSERS to secure the cessation of his pension before an overpayment occurred**. Additionally, despite this notice and this knowledge, [Dr. Lebron] **made no inquiries to see if PSERS had reviewed ASPIRA's determination** that [Dr. Lebron's] post-retirement return to employment had occurred in a bona fide emergency or shortage of other personnel. Based on these occurrences, **he had knowledge or notice of a possible error before ever accepting the position at Olney in 2011**. Therefore, he could have taken action to preserve his benefits long prior to PSERS[] ever learning of his return to work in 2015 and then notifying [Dr. Lebron] of the need to make the adjustment to his annuity required by the Retirement Code.

Board Op. at 38-39 (emphasis added). The Board also asserted that PSERS' other instructions put Dr. Lebron on notice to confirm that PSERS approved of his post-retirement return to service before accepting the Olney principalship. *See* Board Op. at 37-38. In making these determinations, the Board erroneously imposed a duty on Dr. Lebron to report his return to service to PSERS and get PSERS' approval even though Section 8346(b) of the Retirement Code does not require the same. *See Volpe*.

PSERS has issued various policy statements explaining what it interprets as its members' responsibilities under Section 8346(b) of the Retirement Code. "The value of a statement of policy is that it communicates, in advance of a discrete agency

action, how the agency interprets a law and intends to give it effect." *Borough of Bedford v. Dep't of Envtl. Prot.*, 972 A.2d 53, 61-62 (Pa. Cmwlth. 2009).

Here, Dr. Lebron attended retirement counseling and admitted he read and understood, at a minimum, the notices of PSERS' policy included with the September 6, 2007 Initial Benefit Letter, the April 15, 2009 Finalized Benefit Letter, and the Handbook. The notices in Dr. Lebron's April 15, 2009 Finalized Benefit Letter and the Handbook directed that **it is the annuitant's responsibility "to notify the employer that [he is] a PSERS retiree**[,]" R.R. at 373a, 408a (emphasis added); FOFs 16, 19, which he did. The notices in Dr. Lebron's September 6, 2007 Initial Benefit Letter, the April 15, 2009 Finalized Benefit Letter, and the Handbook stated that **if his return to service *did not qualify* under Section 8346(b) of the Retirement Code** (i.e., he returned to work in circumstances *other than* for an emergency or personnel shortage), **he "*should*" also send a letter to PSERS**. R.R. at 369a, 373a, 408(a) (bold and italic emphasis added); FOFs 13, 16, 19. Thus, as **Peechatka confirmed**, based upon the wording in Section 8346(b) of the Retirement Code and the PSERS' policy statements, **Dr. Lebron was not required to notify PSERS that he was returning to service in an emergency or shortage of appropriate personnel** capacity in 2011, **and the Board agreed** ("[Dr. Lebron] had no positive duty under the Retirement Code to notify PSERS of his return to school service[.]" Board Op. at 40); *see also Volpe*. Thus, the Board's imposition of a duty on Dr. Lebron is without support in the statute and the record.

In *Volpe*, the Board similarly acknowledged that the Retirement Code did not impose a positive duty on retirees to notify PSERS of a return to school service in emergency or shortage of appropriate personnel circumstances. Volpe was employed by the SDP as a Subsidies Technical Assistant (handling the SDP's financial operations) until he retired in July 1998. Because the SDP's staff could not handle Volpe's former duties, the SDP asked him to return to work two days per

27

week for the 1998-1999 school year. Volpe accepted and worked part-time for the SDP while collecting his pension. Volpe had received retirement counseling about the effect of returning to service and also received and read PSERS' 2000 Handbook. Despite the SDP's claims that it was trying to train Volpe's replacement, the trainees left for one reason or another. And, after PSERS informed the SDP in 2008 that it needed to make a bona fide effort to hire qualified non-annuitants rather than hire better-qualified retirees, the SDP advertised Volpe's position for a few days each year.[29] Volpe applied for the job and was hired each year until 2012. In November 2012, PSERS notified Volpe that his employment did not satisfy the exceptions in Section 8346(b) of the Retirement Code, and ordered him to repay nearly $70,000.00 in retirement benefits and uncredited service.[30] On appeal, the Board agreed that Volpe failed to produce evidence that an emergency or shortage of appropriate personnel existed from 1998 until 2012 while he continued to collect his annuity payments, and that Volpe had a duty to report his return to service to PSERS. On further appeal, this Court disagreed.

The *Volpe* Court found that Volpe notified the SDP of his retirement status, but concluded that, since there was no statutory requirement, administrative regulation, or policy statement that required or even advised Volpe to inform PSERS that he returned to school service under Section 8346(b) of the Retirement Code, the Board improperly imposed an implied duty on Volpe to notify PSERS of his return to service no matter the circumstances. The *Volpe* Court also declared that the Board's reliance on the Handbook's reservation of rights in light of the other evidence did not support the Board's conclusion that Volpe knew or was on notice that the SDP had

---

[29] Clearly, the SDP was aware of its responsibilities when hiring an annuitant well before ASPIRA hired Dr. Lebron on its behalf.

[30] Volpe retired again when PSERS undertook the 2012 investigation. Upon his retirement, PSERS' adjustment reduced his monthly retirement benefit by approximately 60%.

erroneously determined that an emergency existed justifying Volpe's return to school service while collecting his annuity payments.

The *Volpe* Court reasoned:

PSERS'[] action in advising [Volpe] only to tell [the] SDP upon his return to school service that he is a PSERS retiree, but then penalizing him by taking a portion of his pension when he failed to do more, is arbitrary. **PSERS created a gap in communication** when it advised [Volpe] to tell [the] SDP that he is a PSERS retiree but then did not advise either [Volpe] or [the] SDP to report his return to school service to PSERS. **PSERS could have readily filled this gap**. The State Employees' Retirement Code, which governs the retirement of state employees and officers, contains a provision similar to that of Section 8346(b) of the Retirement Code. *See* Section 5706(a.1) of the State Employees' Retirement Code, 71 Pa. C.S. § 5706(a.1). Similar to Section 8346(b) of the Retirement Code, Section 5706(a.1) of the State Employees' Retirement Code permits a former state employee to return to State service without jeopardizing his or her pension if there is an emergency. Pursuant to Section 5706(a.1) of the State Employees' Retirement Code, the Governor has issued Management Directive 515.20 establishing 'policy, responsibilities, and procedures for reemployment of persons retired from commonwealth service.' ([*See*] Management Directive 515.20 Amended (July 20, 2015).) Management Directive 515.20(7.a.) clarifies that when an agency '[d]etermines that an emergency requires the temporary reemployment of an annuitant,' **the agency must complete a form** with certain information about the annuitant, forward that form to the Office of Administration for approval, which must then forward the form and justification to the State Employees' Retirement System (SERS). (*Id.*) Here, PSERS could have advised either the annuitant or the school district to inform PSERS about the hiring of a retiree, so PSERS could then review to see if a true emergency existed. PSERS does not lack the statutory authority to do so given that it has the right to inspect school district's employment records, and school districts have a corresponding duty to comply.

Sections 8502(f) and 8506(b) of the Retirement Code, 24 Pa.C.S. §§ 8502(f), 8506(b). Alternatively, **PSERS could have required preapproval** before a school district hired a PSERS retiree, as it did with other annuitants that [the] SDP hired. . . . However, **PSERS did not communicate to either [Volpe] or [the SDP] that one or the other was to notify it of the hiring of a retiree or to require preapproval**.

. . . . [Volpe] complied with the only advisory PSERS gave him. [The] SDP knew that [he] was a PSERS retiree. Thereafter, [**Volpe**] **did not receive any notice from PSERS indicating that it disagreed with [the] SDP's determination or that his return to service would affect his pension**. Under these circumstances, it was not unreasonable for [Volpe] to assume that [the] SDP had passed along to PSERS the information that [Volpe] was a PSERS retiree who had returned to school service. It would make little sense for an annuitant to communicate to his employer that he was a PSERS retiree who had returned to service if the employer was not going to pass that information along to PSERS.

Slip op. at 23-25 (emphasis added; footnote omitted).

Applying the *Volpe* Court's reasoning in the instant matter,[31] and based on the statute and PSERS' instructions to retirees, this Court concludes that, where

---

[31] The Board had the benefit of this Court's *Volpe* decision when it issued its August 2019 order in the instant matter. However, the Board claims that this case is distinguishable from *Volpe* because

> [i]n this case, PSERS informed [Dr. Lebron] that he should send a letter to PSERS directly if he was working in a capacity that did not fit a return to service exception, including the one-year limitation, to avoid any overpayment of annuity. The gap in communication that the Commonwealth Court found in *Volpe* does not exist in this case between PSERS and [Dr. Lebron].

Board Op. at 40 (record citations omitted). Despite that Dr. Lebron had the benefit of more than PSERS' Handbook, and Section 8346(b) of the Retirement Code which now allows a return to service of up to one school year (as opposed to the 95-day restriction in *Volpe*), the same communication gap that created Volpe's situation now affects Dr. Lebron. Accordingly, *Volpe* is instructive and persuasive here.

30

Dr. Lebron had a reasonable belief that he returned to service in accordance with Section 8346(b) of the Retirement Code, his only duty was to notify ASPIRA that he was a PSERS retiree.[32]  Accordingly, **Dr. Lebron's only burden was to prove that he had a reasonable belief his return to service was in accordance with Section 8346(b) of the Retirement Code and that he notified ASPIRA he was a PSERS retiree**.

Despite that Section 8346(b) of the Retirement Code and PSERS' policy statements place the onus on *the employer* to determine that a shortage of appropriate personnel exists, and PSERS created the communication gap, the Board

> place[d] the consequences of [ASPIRA's/the SDP's purported] statutory violations at the doorstep of [Dr. Lebron].  When governmental entities fail to carry out mandatory statutory duties, however, the result of that failure should not be laid at the feet of a person who is entitled to be the recipient of that duty.  Rather, justice and fairness require that the person protected by the statute, here [Dr. Lebron], be given the opportunity to take advantage of the statutory right conferred upon h[im.[33]]

*Higgins v. Pub. Sch. Emps.' Ret. Sys.*, 736 A.2d 745, 750 (Pa. Cmwlth. 1999); *see also Larsen v. State Emps.' Ret. Sys.*, 22 A.3d 316 (Pa. Cmwlth. 2011); *Mullen v. Dubois Area Sch. Dist.*, 259 A.2d 877, 880-81 (Pa. 1969) ("The burden of complying with the statute rests with the school [employer, here ASPIRA/the SDP]; should they

---

[32] Considering what occurred in *Volpe* and the instant case, regardless of PSERS' policy statements and notices, it would certainly behoove an annuitant in these circumstances to notify PSERS of a return to service regardless of whether Section 8346(b) of the Retirement Code exceptions are implicated and, perhaps, seek PSERS' express approval or an advisory opinion, to avoid these unfortunate circumstances.  This Court also urges PSERS to consider changing its policy, developing a written procedure, or promulgating regulations to avoid similar future litigation or, at the very least, more clearly apprise its members of the potential risks highlighted in *Baillie*, *Volpe* and the instant decision.

[33] Dr. Lebron is protected by Section 8346(b) of the Retirement Code.  That provision conferred upon Dr. Lebron the statutory right to simultaneously receive his annuity payments and a salary as an incentive to assist a public school where the school has determined it has an emergency/shortage of appropriate personnel.

31

fail to conduct their business as required, the consequences ought to lie at [their] door, not at the door of their victims. They must not be permitted to advantage themselves of their own failures to the detriment of their employees.").

Under the unique circumstances where the statute and PSERS' instructions did not put Dr. Lebron on notice that he would have the burden of proving that ASPIRA faced an emergency/shortage of appropriate personnel during the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years, he did not participate in nor was he privy to ASPIRA's decision-making, and he did not have access to documentation or other evidence of ASPIRA's efforts to hire a non-annuitant, thereby placing him completely at the mercy of an independent third party not obliged to give him information, or even participate in these proceedings,[34] the Board erred by imposing the burden solely on Dr. Lebron to prove that his return to service was in accordance with Section 8346(b) of the Retirement Code.[35]

> Recently, in a case involving criminal law, th[e Pennsylvania Supreme] Court explained that[] '[t]he function of a standard of proof, as that concept is embodied in the Due Process Clause [of the United States Constitution] and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. While the risk of error in a particular adjudication does not vary depending on the standard of proof adopted, the burden allocates that risk between the parties.' [*Commonwealth v.*] *Sanchez*, 36 A.3d [24,] 65 [(Pa. 2011)] (citations omitted). . . . A more stringent burden of production and persuasion imposes a higher risk of an erroneous decision on the party upon which the burden rests. Thus, shifting the burden of proof onto a defendant places the risk of an erroneous

---

[34] Dr. Nuñez's testimony was only available to Dr. Lebron because ASPIRA no longer employed Dr. Nuñez and she agreed to testify on his behalf. She did not have access to ASPIRA's records. *See* R.R. at 96a.

[35] Where PSERS' interpretation of the Retirement Code is clearly erroneous, it may be overturned. *Baillie*.

> decision upon the defendant. The determination of whether such a shift is suitable rests . . . primarily on considerations of whether the shift vindicates the public policy at issue. In addition, we consider difficulties of adducing evidence to prove a negative, the parties' relative access to evidence, and whether placing the burden of proof on one party is necessary to help enforce a further right, constitutional or otherwise. *See Sanchez*, 36 A.3d at 67.

*Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 408-09 (Pa. 2014).

Here, notwithstanding that Dr. Lebron did not have the burden to prove that ASPIRA faced an emergency/shortage of appropriate personnel for the subject school years, because Dr. Lebron reaped the benefit of simultaneously collecting his annuity and a salary, and he faced the potential of having to return retirement benefits he received that were not in accordance with Section 8346(b) of the Retirement Code, he had to have a *reasonable belief* that his return to service complied with Section 8346(b) of the Retirement Code. Therefore, this Court rules that **Dr. Lebron had the burden to prove that he had a reasonable basis to believe his return to service for each school year complied with Section 8346(b) of the Retirement Code and that he notified ASPIRA he was an annuitant**. **Once Dr. Lebron met his burden, the burden shifted to PSERS to prove either that ASPIRA did not exercise its judgment under Section 8346(b) of the Retirement Code, or that ASPIRA's judgment in employing Dr. Lebron during each of those years was not based on an emergency or a shortage of appropriate personnel**. Consequently, both Dr. Lebron and PSERS had a burden of proof.

### 3. ASPIRA's Judgment

According to Section 8346(b) of the Retirement Code, Dr. Lebron could return to service, collect a salary, and still receive his retirement annuity if, in ASPIRA's/the SDP's judgment: (1) there was "**an emergency** [that] create[d] an increase in the work load such that there [was] serious impairment of service to the

public **or** [there was] **a shortage of appropriate** . . . **personnel**," *and* (2) his service **did not exceed the school year** during which the emergency or personnel shortage occurred. 24 Pa.C.S. § 8346(b) (emphasis added).

Dr. Lebron asserts that the Board erred by ignoring ASPIRA's determination that he returned to service at Olney for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years pursuant to the emergency/shortage of appropriate personnel exception under Section 8346(b) of the Retirement Code.[36] Because Dr. Lebron relied upon ASPIRA's representations that there were no other suitable non-annuitant candidates for Olney's principal position, rather than an emergency, **this Court will examine whether Dr. Lebron's return to service qualified under Section 8346(b) of the Retirement Code's** *shortage of appropriate personnel exception*.[37] Further,

> our duty on review is to determine whether the [Board's] findings [we]re supported by substantial evidence. The finding[s] needed to support a decision in [PSERS'] favor [we]re that (1) [there was no shortage of appropriate

---

[36] In response to Dr. Lebron's request for argument on his exceptions, the Board referenced "Section 201.12 of the Board's [R]egulations, 22 Pa. Code § 201.[1]2 [reserved]," making GRAPP applicable to Board proceedings. Section 35.214 of GRAPP authorizes the Board to conduct oral argument on exceptions. *See* 1 Pa. Code § 35.214. However, the Board concluded: "The Board does not believe that oral argument is necessary in helping the Board understand and resolve the issues and, therefore, denies [Dr. Lebron's] request." Board Op. at 2. The Board did not err by denying oral argument.

[37] Dr. Lebron repeatedly refers to ASPIRA invoking the *emergency* exception under Section 8346(b) of the Retirement Code. In order for that specific exception to apply, ASPIRA had to establish that "an emergency create[d] an increase in the work load such that there [was] serious impairment of service to the public[.]" 24 Pa.C.S. § 8346(b). Further, the *Volpe* Court accepted the Board's interpretation that an *emergency* was "sudden, unexpected, unforeseen and require[d] immediate action." Slip op. at 10 (adopting and quoting the hearing examiner's definition). However, neither ASPIRA nor Dr. Lebron provided evidence to PSERS or the Board that an increased workload seriously impaired ASPIRA's/SDP's service to the public, or they faced sudden, unexpected, unforeseen circumstances that required immediate action, thereby creating an emergency. Accordingly, like the Board, *see* Board Op. at 27, this Court will review whether the Board erred by concluding that there was insufficient evidence to support ASPIRA's claim that Dr. Lebron's employment was permissible due to a *shortage of appropriate personnel*.

34

personnel during the subject school years, and/or (2) Dr. Lebron's return to service exceeded the school years during which the personnel shortages occurred. *See* 24 Pa.C.S. § 8346(b).]

*S. Hills Health Sys. v. Dep't of Pub. Welfare*, 510 A.2d 934, 936 (Pa. Cmwlth. 1986).

### a. Shortage of Appropriate Personnel

Dr. Lebron had to demonstrate that he had a reasonable basis to believe that his return to service for each of the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years was due to a shortage of appropriate personnel. Thereafter, "[s]ince [PSERS] assert[ed] [that ASPIRA did not face a shortage of appropriate personnel for the subject school years], [PSERS] had the burden of proving [the same]." *Id.* at 935; *see also Baillie; Wingert*.

As stated previously, when investigating shortage of appropriate personnel cases, PSERS looks at evidence of good faith steps the employer took to secure a non-annuitant for the position. Peechatka pronounced that "the Retirement Code does not address the best qualified, only the shortage." R.R. at 179a. Notwithstanding, Section 8346(b) of the Retirement Code expressly references "a shortage of *appropriate* . . . personnel[.]" 24 Pa.C.S. § 8346(b) (emphasis added).

Here, PSERS directed ASPIRA to provide any and all evidence of its efforts to hire non-annuitants for the subject school years. Unfortunately, ASPIRA did not submit its original job postings or advertisements, so PSERS could not determine what ASPIRA listed as the specific requirements for the position. ASPIRA provided only the other 2011 candidates' resumes and the rejection letters in which ASPIRA informed them that, although their "'skills and qualifications were excellent,' it had 'chosen to hire another candidate for the position.'" R.R. at 5a. The only other evidence available to Dr. Lebron was Dr. Nuñez's testimony.

35

Dr. Nuñez testified that Dr. Lebron's employment as Olney's principal for the 2011-2012 and 2012-2013 school years was necessitated by a shortage of appropriate personnel, and that ASPIRA made a bona fide effort to locate and hire non-annuitants that met SAC's criteria before contracting with Dr. Lebron. However, the Board found Dr. Nuñez's testimony in that regard not credible.

The Board's credibility determination stemmed, in part, from ASPIRA's financial interest in the outcome of this matter. In particular, the Board concluded that ASPIRA stands to "incur debt with PSERS due to PSERS' determination, because ASPIRA will owe its employer share of contributions for each year of [Dr. Lebron's] employment, plus interest for each year that the employer's contribution [w]as not [] received[.]" Board Op. at 31. The Board also declared that Dr. Nuñez "may bear some responsibility for ASPIRA's hiring of [Dr. Lebron] without clearing it with PSERS, so she has a motive to be other than frank on this point." Board Op. at 31. However, there is no record evidence that Dr. Nuñez bore any individual responsibility for hiring Dr. Lebron or any of ASPIRA's other principals, and she was no longer an ASPIRA employee when she gave her testimony in July 11, 2018 (more than five years after she left ASPIRA).

In addition, the Board declared that "[i]t is also impossible to credit [Dr. Nuñez's] testimony so long after the fact[.]" Board Op. at 31. Although it is common knowledge that the passage of time can affect a witness's memory, the Board does not cite to, and this Court did not locate, any legal basis for the Board's conclusion that the mere passage of time itself supports a finding that Dr. Nuñez's testimony was not credible. There is nothing in the record to support a finding that time affected Dr. Nuñez's memory. This Court is also perplexed by the Board's utilization of a double standard in declaring the passage of time fatal to Dr. Nuñez's credibility without reaching the same conclusion regarding Dr. Lebron's testimony. *See R.J.W. v. Dep't of Human Servs.*, 139 A.3d 270 (Pa. Cmwlth. 2016); *see also A.P.*

36

*v. Dep't of Pub. Welfare*, 98 A.3d 736 (Pa. Cmwlth. 2014). Moreover, where PSERS is authorized to and could have created a system in which it would have discovered Dr. Lebron's situation much sooner or, perhaps, avoided the circumstances altogether,[38] the Board's reliance on the passage of time to discredit testimony is self-serving and disingenuous.

The Board also found Dr. Nuñez's testimony "general[ly] unreliab[le]," Board Op. at 32, because she represented that ASPIRA's hiring team relied on Dr. Lebron to tell it how to return him to service, but Dr. Lebron testified that was not the case. However, reading the testimony in context, what Dr. Nuñez said was that the hiring team relied on Dr. Lebron's representations about the process of employing him as a retiree and, after Dr. Lebron informed the hiring team that it must contact PSERS and the hiring team discussed it, the hiring team appointed the Chief Operating Officer and the Human Resources Director to follow up with PSERS. *See* R.R. at 65a. That testimony is entirely consistent with Dr. Lebron's testimony that, after he informed the hiring team at his May 2011 interview that he could not accept the Olney principal job unless it was an emergency hire and must be cleared with PSERS, the hiring team represented that it would contact PSERS. *See* R.R. at 162a. Because the testimony is not contradictory, the Board's conclusion that Dr. Nuñez's testimony was *generally unreliable* on that basis was flawed.

This Court has held:

> An appellate court may not reweigh the evidence or make credibility determinations. *Leon E. Wintermyer, Inc. v. Workers' Comp[.] Appeal B[d.] (Marlowe)*, . . . 812 A.2d 478, 487-88 ([Pa.] 2002). However, **an appellate court may 'overturn a credibility determination if it is arbitrary and capricious or so fundamentally dependent**

---

[38] PSERS could create a SERS-like system in which the employer must notify PSERS every time an annuitant returns to service, or its own process whereby an annuitant and the employer shall notify PSERS and/or obtain pre-approval any time an annuitant returns to work.

> **on a misapprehension of material facts, or so otherwise flawed, as to render it irrational**.' *Agostino v. T[wp.] of Collier*, 968 A.2d 258, 263-64 (Pa. Cmwlth. 2009). A fact finder capriciously disregards evidence 'when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result.' *Id.* at 264 (quoting *Arena v. Packaging Sys[.] Corp[.]*, . . . 507 A.2d 18, 20 ([Pa.] 1986)).

*Spencer v. City of Reading Charter Bd.*, 97 A.3d 834, 842 (Pa. Cmwlth. 2014) (emphasis added; footnote omitted). This Court finds the Board's credibility determinations flawed and evident of the Board's effort to justify its decision without record or legal support.

Further, several findings the Board made to reach its conclusion that ASPIRA did not employ Dr. Lebron at Olney for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years because of shortages of appropriate personnel were not supported by substantial evidence. *See White*.

Specifically, the Board declared that "there is no evidence that when ASPIRA hired [Dr. Lebron] . . . , ASPIRA had determined the principal position at Olney to be unfillable due to a shortage of other personnel." Board Op. at 29. That is not the standard. Rather, Section 8346(b) of the Retirement Code requires "a shortage of *appropriate . . . personnel*" for the exception to apply. 24 Pa.C.S. § 8346(b) (emphasis added). Notwithstanding, the Board concluded that there was not a personnel shortage that required ASPIRA to hire Dr. Lebron, because Dr. Nuñez "had two years of experience in the SDP as a principal, 13 years of experience as a superintendent or chief academic officer in the charter school sector, and 11 years of experience as a teacher in the SDP . . . , she had started four other [ASPIRA] charter schools and was the founding principal of ASPIRA's second charter school[,]" Board Op. at 30, and could have done the job.

However, the fact that Dr. Nuñez participated in hiring principals for ASPIRA's other charter schools for the 2011-2012 and 2012-2013 school years is not relevant to whether there was a shortage of appropriate personnel to be Olney's principal for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years. Although there may have been principal candidates for other schools, PSERS presented no evidence of whether those candidates were "appropriate . . . personnel" under the circumstances. 24 Pa.C.S. § 8346(b). In addition, there is no record evidence that the other charter schools for which Dr. Nuñez hired principals were high schools, let alone new charter schools intended to rehabilitate a notoriously at-risk student body, or whose appropriate candidates included bilingual, African-American, or Latino persons with high school principal experience familiar with the City of Philadelphia, to be aligned with the at-risk student demographic. Accordingly, the Board improperly reached its conclusion based on that evidence.

The Board also spontaneously concluded that, in light of Dr. Nuñez's qualifications, she could have undertaken the preparation for Olney's 2011-2012 school year while ASPIRA continued to search for a non-annuitant to be principal and, thus, ASPIRA did not exhaust all efforts before hiring Dr. Lebron. The Board clarified:

> If the evidence establishes . . . that a school employer has a back-up plan to fill the vacancy with another existing employee, even if only temporarily, that fact does support a finding that a shortage did not exist that would support hiring a PSERS retiree. It contradicts an argument that the employer had no choice but to stop recruiting efforts for the vacancy and hire a retiree. In this case, Dr. Nu[ñ]ez testified that she believed she would have been the back-up plan. . . . This testimony is not the basis for th[e] Board's conclusion that [Dr. Lebron] failed to meet his burden of proving that a shortage of other personnel existed in May 2011, but it does lend support to that conclusion because it shows that

39

ASPIRA had not exhausted its perceived options prior to hiring [Dr. Lebron].

Board Op. at 30-31 n.2. The Board added that "there were five other ASPIRA employees involved in the hiring process[.]" Board Op. at 30-31.

The Board clearly disregarded Dr. Nuñez's testimony that, although she had a principal certificate, was bilingual, and was familiar with charter schools, her experience was in primary education (grades K through 8) and she would not have accepted the position. The Board further assumed, without record support, that Dr. Nuñez and/or the rest of ASPIRA's hiring team of high-level administrative staff had the requisite time, skills, and resources to oversee Olney's construction, interview and hire nearly 200 employees, and research publishing companies and obtain academic resource materials for the 2011-2012 school year. Even if they did, the Board improperly imposed an implied duty on ASPIRA to hire its employees out to the SDP when it cannot immediately locate non-annuitant candidates to fill the SDP's job openings. Accordingly, the Board's findings are without any record basis.

The Board also relied upon the 2011 Olney candidate rejection letters to support its conclusion that, since there were non-annuitant candidates ASPIRA could have hired instead of Dr. Lebron, Dr. Lebron's return to service as Olney's principal did not meet the requirements of Section 8346(b) of the Retirement Code. In those letters, ASPIRA informed the candidates that, although their "'skills and qualifications were excellent,' it had 'chosen to hire another candidate for the position.'" R.R. at 5a. The letters do not support the Board's conclusion. As stated above, Section 8346(b) of the Retirement Code requires a shortage of "*appropriate . . . personnel*" for the personnel shortage exception to apply. 24 Pa.C.S. § 8346(b) (emphasis added). The statutory language clearly reveals that ASPIRA could seek more than just warm bodies for the job. Certainly, a *pro forma* letter politely rejecting candidates, who lacked high school and principal experience, for the task of

reforming an at-risk school is not credible evidence that any of those candidates were "appropriate . . . personnel" for the Olney principalship, particularly during the first year. *Id.* Accordingly, the record does not support the Board's finding.

The Board further concluded that Dr. Lebron's acceptance of the Olney principalship for the 2011-2012 and 2012-2013 school years subject to ASPIRA notifying PSERS that he returned to work, when he did not place that same proviso on his six post-retirement positions within the SDP between September 2007 and June 2011, "is a strong indicator that [Dr. Lebron] understood his return to work at Olney to be *different* from all of his prior returns, [] supporting the finding that ASPIRA initially offered him the position without [] referring to the shortage of other personnel exception." Board Op. at 30. In reaching that conclusion, the Board stated: "[Dr. Lebron], in his prior returns to work under the other personnel shortage exception . . . had *never* sought PSERS' approval." *Id.*

This Court agrees that Dr. Lebron never sought approval for those assignments, and further acknowledges the record evidence that Dr. Lebron's returns to service from September to December 2007 at Microsoft High School of the Future (due to a sudden principal resignation) and from September 2008 to June 2009 at Germantown High School (when he and another veteran principal were asked to temporarily run a persistently dangerous school) were emergency assignments.[39] *See* R.R. at 146a-148a, 151a-152a. However, contrary to the Board's conclusion, Dr. Lebron did *not* testify that his other four assignments were due to emergency/shortages of appropriate personnel. *See* R.R. at 149a-150a, 152a-156a. Moreover, since Dr. Lebron was never asked whether he accepted those post-retirement positions conditioned on the SDP notifying PSERS, the Board could not

---

[39] Dr. Lebron testified that the SDP informed him that his return to service from September to December 2007 at Microsoft High School of the Future had been cleared with PSERS. *See* R.R. at 147a-148a.

know that those instances differed from his Olney principalship job offer in that manner. Further, as stated above, to the extent Dr. Lebron reasonably believed that any of his post-retirement assignments were due to an emergency/shortage of appropriate personnel under Section 8346(b) of the Retirement Code, he was *not* obligated to report his return to service to PSERS. Rather, he understood the employer had the duty to report his return to service to PSERS, if necessary. Dr. Lebron handled his Olney employment in the same fashion. Accordingly, there is no record support for the Board's conclusion that Dr. Lebron's actions relative to his post-retirement returns to service before Olney are "a strong indicator that [Dr. Lebron] understood his return to work at Olney to be *different* from all of his prior returns[.]" Board Op. at 30.

The Board also asserted that Dr. Lebron's Olney contracts for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years are a "strong indicator" that Dr. Lebron was not hired based on a personnel shortage pursuant to Section 8346(b) of the Retirement Code. Board Op. at 32. Specifically, the Board relies on the fact that those contracts did not reference personnel shortages and did reference that he was eligible to participate in PSERS as if he was not an annuitant. However, the contracts contained ASPIRA's standard employment language, including the PSERS contribution language in the same paragraph with other employer-provided benefits. *See* R.R. at 95a-96a. Dr. Lebron expressed his understanding that the PSERS participation language did not apply to him. *See* R.R. at 165a-166a. The Board's interpretations of the above facts and conclusions it drew therefrom are not based on record evidence and, in fact, are contradicted by Dr. Lebron's testimony that the Board found to be credible.

Further, Section 8346(b) of the Retirement Code does not mandate that the reason for hiring be expressly stated in the employment contract. In fact, there's no requirement that Dr. Lebron execute a contract in emergency/shortage of

42

appropriate personnel circumstances for post-retirement employment to qualify under Section 8346(b) of the Retirement Code. Although Dr. Lebron entered into a contract for his September 2008 to June 2009 employment at Germantown High School, the SDP did not give him a contract for his September to December 2007 employment at Microsoft High School of the Future, for his October 2009 to February 2010 employment at Kensington Creative & Performing Arts High School, for his February to June 2010 employment at Lawton Elementary School, or for his August 2010 to June 2011 employment at Randolph Career Academy. *See* R.R. at 147a, 151a-156a. Under the circumstances, there is no record support for the Board's finding that Dr. Lebron's contracts were a "strong indicator" that Dr. Lebron was not hired based on a shortage of appropriate personnel. Because the above factual findings were not supported by substantial evidence, they are not conclusive on appeal. *See White*.

Finally, the Board repeatedly referenced that ASPIRA did not notify PSERS of Dr. Lebron's return to service as Olney's principal or "clear[] it with PSERS[,]" as if ASPIRA had a duty to do so. Board Op. at 31; *see also* FOFs 78-79. However, notwithstanding Dr. Lebron's understanding and/or representations to the contrary throughout this proceeding, neither Section 8346(b) of the Retirement Code nor PSERS' instructions required ASPIRA/the SDP to notify PSERS when, in its judgment, an emergency or shortage of appropriate personnel existed, and there was no statutory or common law requirement that ASPIRA seek pre-approval for Dr. Lebron's return to service under any circumstances. *See Volpe*. The Board erred as a matter of law by concluding otherwise. This Court may overturn PSERS' erroneous interpretation of the Retirement Code. *Baillie*.

The Board credited testimony that Dr. Lebron informed ASPIRA he was a retiree in 2011, and that he expressly conditioned his acceptance of ASPIRA's job offers for the 2011-2012 and 2012-2013 school years on ASPIRA notifying PSERS,

if necessary. Dr. Lebron "did not receive any notice from PSERS indicating that it disagreed with [ASPIRA's] determination or that his return to service would affect his pension." *Volpe*, slip op. at 24. And, ASPIRA did not deduct PSERS contributions from Dr. Lebron's salary during that time.

The Board concluded that "there is no evidence in the record whatsoever about what efforts, if any, ASPIRA/[the SDP] made to locate a non-annuitant for the Olney principalship for [the 2013-2014 and 2014-2015] school years." Board Op. at 33. This Court acknowledges that there is little record evidence of ASPIRA's purported shortage of appropriate personnel for those years. However, Dr. Lebron did not have the burden of proving that was the case, he did not participate in nor was he privy to ASPIRA's decision making, and he did not have access to documentation or other evidence of ASPIRA's efforts to hire a non-annuitant. Dr. Lebron's only burden was to show that he had a reasonable belief that ASPIRA had a shortage of appropriate personnel for each of those school years, and that he notified ASPIRA he was a retiree.

The record is clear that, when ASPIRA offered Dr. Lebron the Olney principalship job for the 2013-2014 and 2014-2015 school years, ASPIRA was aware he was a retiree and "it was [reasonable] for [Dr. Lebron] to assume that [ASPIRA] had passed along to PSERS the information that [Dr. Lebron] was a PSERS retiree who had returned to school service[,]" if necessary. *Volpe*, slip op. at 24. Like the first two contracts, Dr. Lebron "did not receive any notice from PSERS indicating that it disagreed with [ASPIRA's] determination or that his return to service would affect his pension[,]" *id*., and ASPIRA did not deduct PSERS contributions from Dr. Lebron's salary during the latter contract terms. Although Dr. Lebron testified he was satisfied with Dr. Paramo's representations that he was still needed for the 2013-2014 and 2014-2015 school years, *see* R.R. at 109a-111a, 113a-114a; FOFs 68, 74, that vague testimony alone was insufficient to satisfy his burden of proving he had a

44

reasonable belief that ASPIRA was experiencing shortages of appropriate personnel for those school years.

Moreover, the Board did not make a specific finding or conclude that there was not a shortage of appropriate personnel in those years. Rather, the Board's holding is based on its conclusion that Dr. Lebron's evidence did not compel it to find that ASPIRA needed Dr. Lebron for the 2013-2014 and 2014-2015 school years due to a shortage of appropriate personnel. Because the issue here is whether, *in ASPIRA's/the SDP's judgment*, there was a shortage of appropriate personnel, that there was little to no record evidence of "what efforts, if any, [they] made to locate a non-annuitant for the Olney principalship for [the 2013-2014 and 2014-2015] school years[,]" Board Op. at 33, "should not be laid at the feet of [Dr. Lebron.]" *Higgins*, 736 A.2d at 750.

Based on the foregoing, the record evidence supported that Dr. Lebron reasonably believed ASPIRA had the requisite shortages of appropriate personnel under Section 8346(b) of the Retirement Code for the 2011-2012 and 2012-2013 school years and that he communicated to ASPIRA that he was a retiree. The record evidence also supported that ASPIRA exercised its judgment and properly determined that Dr. Lebron's returns to service for those school years were necessitated by shortages of appropriate personnel. That being the case, as the Board readily admits, neither Dr. Lebron nor ASPIRA was required to notify PSERS or seek its approval for Dr. Lebron's return to service for those years.[40] Accordingly, Dr. Lebron was entitled to simultaneously collect his salary as Olney's principal and receive his retirement annuity pursuant to Section 8346(b) of the Retirement Code for

---

[40] This statement is consistent with the Board's conclusion that Dr. Lebron similarly relied on his 2007 to 2011 post-retirement employers to determine that those assignments were necessitated by emergencies/shortages of appropriate personnel in accordance with Section 8346(b) of the Retirement Code.

the 2011-2012 and 2012-2013 school years, and the Board erred by concluding otherwise.

The same cannot be said for the 2013-2014 and 2014-2015 school years. There was insufficient record evidence for the Board to conclude whether Dr. Lebron reasonably believed ASPIRA had the requisite shortage of appropriate personnel under Section 8346(b) of the Retirement Code for the 2013-2014 and 2014-2015 school years, and whether ASPIRA properly exercised its judgment, or ASPIRA's judgment in employing Dr. Lebron during those years was based on a shortage of appropriate personnel. Accordingly, this matter is remanded to the Board to afford Dr. Lebron adequate means and time to obtain evidence,[41] and for the Board to thereafter conduct a hearing at which Dr. Lebron will have the opportunity to prove he had a reasonable belief that his returns to service for the 2013-2014 and 2014-2015 school years were due to shortages of appropriate personnel. If Dr. Lebron meets his burden, then PSERS has the burden to prove for the 2013-2014 and 2014-2015 school years either that ASPIRA did not exercise its judgment, or that ASPIRA's judgment in employing Dr. Lebron during those years was not based on a shortage of appropriate personnel. The Court's remand is limited to the 2013-2014 and 2014-2015 school years.

### b. Exceeded the School Year

Section 8346(b) of the Retirement Code also limits an annuitant's return to service to a school year. *See* 24 Pa.C.S. § 8346(b). Dr. Lebron was aware that the

---

[41] GRAPP allows Dr. Lebron to obtain subpoenas from the Board to compel the production of documentary evidence and witness testimony, *see* 1 Pa. Code § 35.142, and to take depositions in lieu of hearing testimony, if necessary. *See* 1 Pa. Code § 35.145. In addition to GRAPP, the Board's rules specifically contemplate the use of subpoenas to compel testimony. *See* 22 Pa. Code § 201.7. Therefore, Dr. Lebron could subpoena ASPIRA's and PSERS' records, and ASPIRA or other witnesses who could shed light on ASPIRA's hiring decisions for the 2013-2014 and 2014-2015 school years.

school year was from July 1 of one calendar year to June 30 of the following year. Dr. Lebron's 2012-2013 contract term was from July 1, 2012 to June 30, 2013. Thus, Dr. Lebron was entitled to collect his salary and receive his retirement annuity during the 2012-2013 school year as prescribed in Section 8346(b) of the Retirement Code.

Dr. Lebron's 2011-2012 contract term was from June 27, 2011 to August 17, 2012. Because Section 8346(b) of the Retirement Code restricted Dr. Lebron's return to service for 2011-2012 to one school year (i.e., July 1 to June 30), Dr. Lebron was only entitled to collect his salary and receive his retirement annuity between July 1, 2011 and June 30, 2012. He was not permitted to collect his salary and receive his retirement annuity for dates outside that range, except, as the Board acknowledged, "the portion of [Dr. Lebron's] first contract prior to that date [(i.e., June 27 to June 30, 2011)] may be discounted[,]" Board Op. at 28, because ASPIRA did not participate with PSERS until July 1, 2011.

Thus, Dr. Lebron was not entitled to the retirement benefits he received for the 48 days from July 1 to August 17, 2012 that extended beyond the 2011-2012 school year. Accordingly, we remand this matter to the Board for it to recalculate what Dr. Lebron owes, allowing adjustments only for the 48 days that exceeded the 2011-2012 school year.

In addition, if the Board determines, after a hearing, that Dr. Lebron had a reasonable belief his returns to service for the 2013-2014 and/or 2014-2015 school years were in accordance with Section 8346(b) of the Retirement Code, and PSERS fails to prove either that ASPIRA did not exercise its judgment or that ASPIRA's judgment in employing Dr. Lebron during those years was not based on a shortage of appropriate personnel, then Dr. Lebron would be entitled to retain the retirement annuity he received during those school years (i.e., from July 1, 2013 to June 30, 2014, and/or from July 1, 2014 to June 30, 2015). Dr. Lebron would not be entitled to, and would have to repay, the retirement benefits he received for the 31 days (from

47

July 1 to July 31, 2014) that extended beyond the 2013-2014 school year. In that event, the Board shall further recalculate Dr. Lebron's repayment accordingly.

### 4. Waiver

Lastly, Dr. Lebron contends that the Board erred by determining that he did not qualify for the hardship exception under Section 8303.1 of the Retirement Code. That Section states:

> Upon appeal by an affected member, beneficiary or survivor annuitant, the [B]oard may waive an adjustment or any portion of an adjustment made under [S]ection 8534(b) [of the Retirement Code] (relating to fraud and adjustment of errors) if in the opinion of the [B]oard or the [B]oard's designated representative:
>
> > (1) the adjustment . . . will cause undue hardship to the member . . . ;
> >
> > (2) the adjustment was not the result of erroneous information supplied by the member . . . ;
> >
> > (3) the member had no knowledge or notice of the error before adjustment was made, and the member . . . took action with respect to [his] benefits based on erroneous information provided by the system; and
> >
> > (4) the member . . . had no reasonable grounds to believe the erroneous information was incorrect before the adjustment was made.

24 Pa.C.S. § 8303.1(a). This Court has declared that "[a c]laimant must satisfy all four provisions of this waiver-of-adjustment provision in order to qualify." *White*, 11 A.3d at 6; *see also Volpe*.

Where, as here, the Board agreed that Dr. Lebron "technically satisfie[d] the second prong of . . . [S]ection 8303.1(a)[ of the Retirement Code,]" insofar as the adjustment to Dr. Lebron's retirement benefits was not caused by any erroneous

information he supplied to PSERS, this Court need only address the first, third and fourth waiver requirements.

Since Dr. Lebron's exceptions did not specifically challenge the Board's conclusions as to the third and fourth waiver requirements, he waived such challenges. *See* 1 Pa. Code § 35.213 ("Objections to any part of a proposed report which is not the subject of exceptions may not thereafter be raised . . . and shall be deemed to have been waived."); *see also Volpe*; *Hairston-Brown v. Pub. Sch. Emps.' Ret. Bd.*, 78 A.3d 720 (Pa. Cmwlth. 2013); *Baillie*. Because the Board concluded that Dr. Lebron did not satisfy the third and fourth requirements of Section 8303.1 of the Retirement Code, he is not entitled to a waiver. *See White.*

### Conclusion

Based on the foregoing, this Court holds that the Board did not deprive Dr. Lebron of his due process rights by not promulgating regulations or granting oral argument on his exceptions, and the Board properly concluded that Dr. Lebron is not entitled to a waiver under Section 8303.1(a) of the Retirement Code.

However, the Board erred by placing the burden of proving shortages of appropriate personnel on Dr. Lebron, and by concluding that no shortage of appropriate personnel existed for the 2011-2012 and 2012-2013 school years. Because the record evidence demonstrates that Dr. Lebron had a reasonable belief that ASPIRA was experiencing a shortage of appropriate personnel for the 2011-2012 and 2012-2013 school years, that he informed ASPIRA he was a retiree, and that ASPIRA properly exercised its judgment in employing Dr. Lebron during those years because of the shortage of appropriate personnel, neither Dr. Lebron nor ASPIRA was obligated to notify PSERS of Dr. Lebron's employment, Dr. Lebron was entitled to simultaneously collect his salary as Olney's principal and receive his retirement annuity pursuant to Section 8346(b) of the Retirement Code for the 2011-2012 and

49

2012-2013 school years, but only between July 1, 2011 and June 30, 2012 for the 2011-2012 school year. Accordingly, this Court reverses the portion of the Board's order denying Dr. Lebron's request that his post-retirement employment with ASPIRA for the 2011-2012 and 2012-2013 school years be deemed a permissible return to school service under Section 8346(b) of the Retirement Code. This Court vacates the portion of the Board's order directing Dr. Lebron to repay retirement benefits as detailed in PSERS' November 5, 2015 letter. Rather, Dr. Lebron is directed to repay only those retirement benefits he received for the 48 days that extended beyond the 2011-2012 school year. This matter is remanded to the Board to recalculate what Dr. Lebron owes consistent with this Opinion.

In addition, this Court vacates the portion of the Board's order denying Dr. Lebron's request that his post-retirement employment with ASPIRA for the 2013-2014 and 2014-2015 school years be deemed a permissible return to school service under Section 8346(b) of the Retirement Code. The record is clear that Dr. Lebron notified ASPIRA that he was a retiree on at least two occasions. The Court remands this matter to the Board to allow Dr. Lebron sufficient time to obtain subpoenas from the Board to compel the production of documentary evidence and witness testimony, including from ASPIRA and PSERS, and depositions in lieu of hearing testimony, if necessary. Thereafter, the Board shall conduct a hearing at which Dr. Lebron has the opportunity to prove he had a reasonable belief that his returns to service for the 2013-2014 and/or 2014-2015 school years were due to shortages of appropriate personnel. If Dr. Lebron meets his burden, then PSERS has the burden to prove either that ASPIRA did not exercise its judgment, or that ASPIRA's judgment in employing Dr. Lebron during those school years was not based on a shortage of

50

appropriate personnel.  If necessary, the Board shall further recalculate Dr. Lebron's repayment accordingly.


_____
ANNE E. COVEY, Judge

51

Jose E. Lebron, : 
                Petitioner : 
                 : 
          v. : 
                 : 
Public School Employees' : 
Retirement Board, :   No. 1265 C.D. 2019
             Respondent : 

## O R D E R

AND NOW, this 30th day of October, 2020, this Court AFFIRMS the portions of the Public School Employees' Retirement Board's (Board) order dated August 9, 2019 (mailed August 16, 2019) denying Jose E. Lebron's (Dr. Lebron) request for oral argument, and a waiver pursuant to Section 8303.1(a) of the Retirement Code, 24 Pa.C.S. § 8303.1(a).

FURTHER, this Court REVERSES the portion of the Board's order denying Dr. Lebron's request that his post-retirement employment with ASPIRA, Inc. of Pennsylvania (ASPIRA)/the School District of Philadelphia for the 2011-2012 and 2012-2013 school years be deemed a permissible return to school service under Section 8346(b) of the Retirement Code, 24 Pa.C.S. § 8346(b).

FURTHER, this Court VACATES the portion of the Board's order directing Dr. Lebron to repay retirement benefits as detailed in the Public School Employees' Retirement System's (PSERS) November 5, 2015 letter. Rather, Dr. Lebron is directed to repay only those retirement benefits he received for the 48 days that extended beyond the 2011-2012 school year. This Court REMANDS the matter to the Board for an adjustment recalculation consistent with this Opinion.

FURTHER, this Court VACATES the portion of the Board's order denying Dr. Lebron's request that his post-retirement employment with ASPIRA for the 2013-2014 and 2014-2015 school years be deemed a permissible return to school

service under Section 8346(b) of the Retirement Code, and REMANDS this matter to the Board to allow Dr. Lebron sufficient time to obtain evidence in accordance with this Opinion, and for the Board to thereafter conduct a hearing at which Dr. Lebron has the opportunity to prove he had a reasonable belief that his returns to service for the 2013-2014 and/or 2014-2015 school years were due to shortages of appropriate personnel. If Dr. Lebron meets his burden, then PSERS has the burden to prove either that ASPIRA did not exercise its judgment, or that ASPIRA's judgment in employing Dr. Lebron during those school years was not based on a shortage of appropriate personnel. The Board shall further recalculate Dr. Lebron's repayment accordingly.

Jurisdiction is relinquished.


_____
ANNE E. COVEY, Judge